# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### DECEMBER 1998 SESSION

**FILED**

February 24, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| Appellee, | ) | **C.C.A. NO. 01C01-9709-CR-00412** |
| | ) | |
| VS. | ) | **DAVIDSON COUNTY** |
| | ) | |
| **JOHN EARL SCALES,** | ) | **HON. THOMAS H. SHRIVER,** |
| | ) | **JUDGE** |
| Appellant. | ) | |
| | ) | (First-Degree Murder and Attempted Aggravated Robbery) |

FOR THE APPELLANT:                    FOR THE APPELLEE:

**RAYBURN McGOWAN, JR.**
500 Wilson Pike Circle, Suite F-218
Brentwood, TN 37027
          (On Appeal)

**DAVID I. KOMISAR**
211 Printer's Alley Bldg., Suite 400
Nashville, TN 37201
          (At Trial)

**JOHN KNOX WALKUP**
Attorney General & Reporter

**KAREN M. YACUZZO**
Asst. Attorney General
John Sevier Bldg.
425 Fifth Ave., North
Nashville, TN  37243-0493

**VICTOR S. JOHNSON, III**
District Attorney General

**JOHN C. ZIMMERMANN**
Asst. District Attomey General
Washington Square, Suite 500
222 Second Ave., North
Nashville, TN 37201-1649

OPINION FILED:_____

**AFFIRMED**

**JOHN H. PEAY,**
Judge

**O P I N I O N**

The defendant was convicted of first-degree felony murder and attempted aggravated robbery. Following a sentencing hearing, he was sentenced to life imprisonment for the murder conviction and a concurrent three year term for the attempted aggravated robbery conviction. After his motion for new trial was denied, the defendant filed a notice of appeal with this Court. He presents the following issues for review:

I. Whether the jury's verdict was contrary to the weight of the evidence;

II. Whether his trial counsel rendered ineffective assistance;

III. Whether the trial court erred in failing to give a curative instruction in response to comments Vera Thompson made during her testimony;

IV. Whether the investigating police officers engaged in misconduct by failing to recover surveillance tapes that the defendant argues would have helped him establish his alibi defense; and

V. Whether the trial court erred in denying the defendant's motion for new trial on newly discovered evidence.

Finding no merit to the defendant's claims, we affirm his convictions and sentence.

In the early evening of Wednesday, December 13, 1995, around 6:00 or 6:30 p.m., two men approached Vera Thompson and Alvin Bevels, who were sitting on the patio of Thompson's apartment. At least one of the men carried a gun. They asked Thompson and Bevels for their money and began going through Bevels' pockets. When Thompson spoke to one of the men as if she recognized him as a former neighbor in the apartment complex, the men walked away. They then confronted Chester Martin and his friend. They told Martin to "set it out," which apparently means to give them their money, and began to go through his pockets. When Martin asked them if they were "tripping," one of the robbers said, "You think you're smart." Martin was then shot, and as he attempted to run away, he was shot again.

2

After talking with several witnesses, who gave "real consistent" descriptions of the shooter, the police believed the shooter to be the defendant, who had previously lived in the apartment complex with his sister, Nicole Scales. In an effort to prepare a photographic line-up, the police went to Nicole's new residence. The police told Nicole about the murder, including the approximate time it occurred, and advised her that they were attempting to eliminate her brothers as suspects. At the time, the defendant was in the room, and although the police did not ask him any questions, he volunteered that he had been at Nicole's residence the entire day and evening. Nicole and Lamont, one of the defendant's brothers, agreed the defendant had been home with them all night.

Two eyewitnesses who lived at the apartment complex where the shooting occurred, Vera Thompson and Angela Hornbeck, identified the defendant in a photographic line-up. John Alexander, Jr., who was Martin's companion when he was shot, was also shown a photographic line-up that included the defendant's picture, but he could not identify anyone. The man accompanying the defendant was never identified.

The State's theory at trial was that the defendant attempted to rob Bevels and shot Martin because he was "strung out" on crack cocaine and needed money to support his habit. Thompson testified she was sitting on the patio of her apartment enjoying a "cup of beer" with Bevels when two black males with a gun approached them. Thompson identified the defendant as one of the men, but she did not know the other. According to Thompson, the defendant was wearing a jacket with a hood that was trimmed with fur, but when he approached them, the hood was not on his head. Thompson testified she knew the defendant because he had previously lived next to her in the apartment complex, but the defendant did not appear to recognize Thompson, who was not wearing her glasses at the time. Thompson testified she believed the defendant

3

was playing a joke on them with a fake gun, but Bevels told her to take the men seriously because the gun was real. According to Thompson, she asked the defendant why he no longer visited the neighborhood, which prompted the defendant to recognize her, say to his companion, "Come on, man; let's go," pull the hood over his head, and walk away from them. Thompson testified she then witnessed the defendant and his companion accost another set of individuals entering the apartment complex. Thompson testified she saw the defendant pull a gun and shoot the victim twice.

Bevels' testified that two males, one dark-skinned and one light-skinned, approached him while he sat with Thompson on her patio. Bevels identified the defendant as the dark-skinned male and testified that although the defendant was wearing a blue hood when he approached him, the defendant's face remained visible. According to Bevels, the defendant held a pistol in his stomach and said, "You know what it is." Bevels testified he told the defendant he did not have anything, and the defendant checked his pockets. According to Bevels, when Thompson spoke to the defendant, the defendant appeared to recognize her, and as a result, retreated. Bevels testified the defendant and his companion then approached Martin and Alexander, held a pistol to Martin as if to rob him, and then shot Martin twice.

Hornbeck testified that on the night of the shooting, she was near the window in her second-story apartment when she saw a dark-skinned man wearing a black hooded jacket, carrying a gun, and scuffling with one or two other people. According to Hornbeck, she heard two gunshots shortly thereafter. She testified that because the man with the gun "turned right into the light under [her] window," she recognized him as a former resident who had lived in the apartment complex with his sister, Nicole. Hornbeck identified the defendant as the shooter.

4

To defeat the testimony of these three eyewitnesses, the defendant relied upon an alibi defense. Alexander, Martin's companion when he was shot, testified he had made eye contact with the shooter and that the shooter was a light-skinned black male, not a dark-skinned black male. He could not identify the defendant as the shooter.

Terry Meese testified that on December 13, 1995, around 3:30 p.m., he visited the defendant at his apartment and within the next hour, they went to a Pharmart convenience store, where they purchased some soda. According to Meese, they then returned to Meese's apartment, where they watched television throughout the early evening and ate a supper Meese's girlfriend prepared. Meese testified that the defendant then took a short nap and left his apartment around 9:15 p.m. Meese's girlfriend and the defendant substantially corroborated this testimony.

A manager at the Pharmart convenience store testified that Meese came to the store on Friday, December 15, 1995, and asked for the surveillance tapes from the afternoon of December 13. According to the manager's testimony, she told Meese that she could release the surveillance tapes only to a police officer. Meese testified that when he learned the defendant had been arrested for murder, he contacted Detective Roland of the Metropolitan-Nashville Police Department and told him that surveillance tapes at the Pharmart convenience store would prove that he and the defendant had been there December 13. Officer James Scales of the Metropolitan-Nashville Police Department, one of the defendant's brothers, also testified that he called Detective Roland as soon as he learned of the defendant's arrest. According to Officer Scales, he called Detective Roland in order to get more information on the arrest, to tell him about the surveillance tapes, and to give him names of alibi witnesses, but Detective Roland became agitated by this information and by Officer Scales' questions. According to Officer Scales, when he asked Detective Roland if he was planning to retrieve the

5

surveillance tapes, Detective Roland hung up on him.

Detective Roland testified that Officer Scales called him on Friday, December 15, to give him names of alibi witnesses, but he first learned of the possible existence of surveillance tapes on December 18, when Meese called him. According to Detective Roland, he then called the Pharmart store and spoke with a clerk, who told him that she did not have access to the surveillance tapes and that he needed to talk with a manager. Detective Roland testified he left a message for the manager, and when he finally spoke with her on December 21, she informed him that the tapes were no longer available and that even if they had been available, they would not have reflected the date or whether the time was a.m. or p.m. According to the Pharmart manager, approximately one week passed between the time she spoke with Meese and a police officer contacted her about getting a copy of the surveillance tapes, but by then, the tapes were unavailable because they had been taped over, erased, or otherwise destroyed.

Several people acquainted with the defendant testified that the defendant did not appear as if he took drugs. The defendant himself testified he was not a drug addict and had not been using crack cocaine within six months of the murder, although he did admit to using marijuana at least twice a week during that time. He denied killing Martin and testified he was with Meese when the shooting occurred. The defendant also testified that on the night of the murder, when Detective Roland and other police officers visited his sister Nicole's residence, he said he had been at her residence that evening, but he did not indicate how long he had been there. He testified that when he talked with the police that evening, it had "slipped [his] mind" he had been with Meese at the time the shooting occurred because, according to the defendant, he was distracted by his curiosity why the police were interested in where his brother Lamont had been that evening.

6

# I.

The defendant first argues that the verdict is contrary to the weight of the evidence, in that the testimony of his alibi witnesses "objectively" outweighs the testimony of the State's eyewitnesses. The defendant does not challenge the sufficiency of the evidence. Questions concerning witnesses' credibility, the weight and value given to evidence, and all factual issues raised by the evidence are resolved by the trier of fact, not by this Court. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). While the trial court may sit as "thirteenth juror" and grant a new trial if it disagrees with the jury about the weight of the evidence, Tenn. R. Crim. P. 33(f), this Court may not, Cabbage, 571 S.W.2d at 835. For this reason, the defendant's argument must fail.

# II.

The defendant next argues that the ineffectiveness of his trial counsel entitles him to a new trial. According to the defendant, his trial counsel, David Komisar, was ineffective because he failed to object or move to strike when Thompson made "highly prejudicial" statements during her testimony; failed to attack Thompson's credibility by questioning her about her criminal record; and failed to object to questioning during the defendant's testimony regarding the method he employed to use crack cocaine. The defendant also argues that the attorney appointed to represent him during the preliminary hearing, Bobby Ballinger, was ineffective for failing to obtain the Pharmart surveillance tapes.

In challenging the effectiveness of counsel, the defendant has the burden of establishing that he received deficient representation and that this deficiency

7

prejudiced him. Strickland v. Washington, 466 U.S. 668, 686 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Deficient representation occurs when counsel provides assistance that falls below the range of competence demanded of criminal attorneys. Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991). Prejudice is the reasonable likelihood that but for deficient representation, the outcome of the proceedings would have been different. Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994). On review, there is a strong presumption of satisfactory representation. Barr v. State, 910 S.W.2d 462, 464 (Tenn. Crim. App. 1995).

When determining whether counsel's performance was deficient, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Further, unless the defendant carries his burden to show that the evidence contained in the record preponderates against a trial court's findings of fact, those findings are conclusive. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991); Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

Here, at the conclusion of the hearing on the defendant's motion for new trial, in which the defendant raised the issue of ineffective assistance, the trial court's findings of fact included the following:

> Mr. Komisar testified, and I believe it to be true, that he spent over a hundred hours in preparation. Moreover, at his request, the Court permitted the hiring of Jim Ball.
>
> Jim Ball is a former Metro Homicide detective; and I can tell you, from -- from personal association with Mr. Ball at -- at the Metro Police Department, he's one of the most effective, best criminal investigators I ever saw in any context.

8

Mr. Ball, I assume, earned the thousand dollars that I authorized to be paid to him for his investigative work.

Mr. Komisar has experience in the State Attorney General's Office, he was a former Assistant District Attorney, and has been in private practice now for some years, and is an experienced and capable lawyer.

And that experience and ability were certainly present in the representation of Mr. Scales. Mr. Scales got a first-class defense at the hands of Mr. Komisar. The -- I think the record will reflect that none of the allegations about his shortcomings are -- are, in fact, true.

And I find, as a matter of fact, that Mr. Komisar did an excellent job of representing Mr. Scales and that it was far beyond that normally expected in the criteria set out in Baxter against Rose. There is no merit to the complaint that -- that Mr. Komisar's representation was defective.

## A.

The defendant first complains that Mr. Komisar failed to object to certain remarks Vera Thompson made during her testimony, which included the following:

* When asked if she picked out the defendant's picture from the photographic lineup, Thompson replied she did and then stated, to the defendant, "You know you did it, boy. He did it."

* When asked how often she would see the defendant when he lived in her apartment complex, Thompson replied, "Well, we -- most nigh [sic] everyday because -- uh -- not putting him down or anything; but, he -- he was a Crack head. And, Crack heads can't stay in the house all day."

* At the conclusion of direct examination, following a pause in the proceedings, Thompson remarked, without prompting, "Why did you do it?"

* When asked on cross-examination whether she recognized or knew who was with the defendant on the night of the murder, Thompson replied, "No. And that -- that's scarey [sic], too. See, you really need to tell us who the other man was so you won't take the rap by yourself."

The record fails to reflect any objections, requests for curative instructions, or motions to strike these statements.

At the hearing on the motion for new trial, Mr. Komisar testified he remembered Thompson offering numerous extemporaneous statements during her

9

testimony. When asked whether he thought her remarks had any effect on the jury, Mr. Komisar replied, "Vera Thompson had a great effect on the jury. I think Vera Thompson was -- was the -- the most crucial witness for -- for the State. Now, as to those particular statements, whether those had an effect on a jury, I wouldn't -- I mean, she was a very powerful witness for the State." Given that this was the extent of the evidence on whether Mr. Komisar was ineffective for failing to object to Thompson's statements, the defendant's argument must fail. The absence of evidence on this issue renders it "practically impossible" to show the prejudice necessary to prove ineffective assistance on this basis. See Strickland, 466 U.S. at 687. As the State points out, it is certainly possible that Mr. Komisar did not object to Thompson's statements for fear his objection would have emphasized her comments and called more attention to them. The defendant has not carried his burden of showing that Mr. Komisar's representation was deficient for failing to object to these remarks and that this deficiency prejudiced him.

**B.**

The defendant next argues that Mr. Komisar was ineffective because he failed to impeach Thompson's credibility by questioning her about her criminal record. At the hearing on the motion for new trial, Mr. Komisar testified that he was unsure whether Thompson's prior convictions were the type that could have been used for impeachment purposes. Because the record does not reflect the nature of Thompson's prior convictions, we cannot properly evaluate this issue in light of Mr. Komisar's testimony. For all we know, Thompson's convictions would have been prohibited from introduction for impeachment purposes by the Tennessee Rules of Evidence.

Despite this, the record reflects that Mr. Komisar engaged in great efforts to impeach Thompson on grounds other than her criminal record. During her trial

10

testimony, Thompson admitted to once having a serious alcohol and drug abuse problem. She also admitted to taking multiple medications for various ailments and to drinking beer at the time she witnessed the shooting. Although Thompson testified that her doctor told her she could drink beer while on her medication, Mr. Komisar called an expert medical witness who testified that drinking beer while taking the medication Thompson was taking would intensify the medication's side effects, which included dizziness and blurred vision, and would greatly impair the patient's vision. Despite this testimony, the jury still accredited Thompson's testimony that she had no doubt the defendant was the man who attempted to rob Bevels and shot Martin. The defendant has not shown how further impeachment by introducing evidence of Thompson's prior convictions---whatever the nature of those convictions might be---would cause the jury to reject Thompson's testimony. Thus, because the defendant has not shown prejudice, his argument must fail.

**C.**

The defendant also argues that Mr. Komisar was ineffective for failing to object to testimony regarding the defendant's past drug use. The defense filed a motion in limine to exclude "[a]ny references to any prior criminal conduct or bad acts by the Defendant." The defendant does not cite---and our independent review of the record does not disclose---a ruling on this motion. At the close of the State's evidence, the prosecutor advised the court and the defense that in a pretrial statement, the defendant had denied having a drug problem, but had admitted to using illegal drugs twice a week. The prosecutor stated that it would request a jury-out hearing on the admissibility of that statement "should that issue come up." Subsequently, during its presentation of proof, the defense introduced evidence of the defendant's good character, and on cross-examination, the prosecutor attempted to impeach this evidence with questions regarding the defendant's drug usage.

The defendant does not seem to take issue with the State's "mere impeachment" of defense witnesses by reference to his prior drug usage. Rather, the defendant argues that "State counsel went beyond mere impeachment . . . to the extent that counsel for the State had the Defendant explaining the proper method in which to smoke crack." The characterization of this questioning as "the proper method in which to smoke crack" is not quite accurate. The trial transcript reflects that during his testimony, the defendant denied he had been using crack cocaine around the time of the shooting, but he admitted using crack cocaine at a previous time in his life. The prosecutor asked, "When you would do crack cocaine, would you explain to the ladies and gentlemen of the jury how you would do crack cocaine? How did you do it?" The defendant replied he smoked it. The prosecutor asked, "How did you smoke it? Can you explain that to them? They may not know." The defendant replied, "Just hold up a lighter

12

and light it up to a stem and put the stuff on there and just smoke it." The prosecutor asked, "Like, to a pipe?" The defendant replied affirmatively and added, "Sort of like smoking opium." The defendant further explained that he had seen people on television smoking opium.

Mr. Komisar failed to object during this line of questioning, but this failure does not render his assistance ineffective. The defendant has not proven that Mr. Komisar's failure to object constitutes deficient performance. As stated previously, choosing not to object may be a strategic decision to not unduly emphasize prejudicial testimony. The transcript from the motion for new trial hearing seems to indicate that Mr. Komisar in fact had good reason not to object to this line of questioning; when asked why he did not object, Mr. Komisar did not answer, replying that the attorney/client privilege prevented him from fully and accurately answering that question. As the record stands, however, there is strong indication that strategy motivated Mr. Komisar's decision not to object. Because this Court will not second-guess strategic decisions, the defendant has not proven deficient performance.

Even so, by the defendant's own admission, he had previously used crack cocaine. As the State points out, "If the jury intended to use that fact against him, it would have done so regardless of whether he chose to inhale it, smoke it, or inject it." Thus, even assuming that Mr. Komisar's performance was deficient for failing to object, the defendant has not shown how he was prejudiced.

## D.

The defendant also argues that the attorney who represented him at his preliminary hearing, Bobby Ballinger, rendered ineffective assistance because he failed to obtain the surveillance tapes from the Pharmart convenience store. Because Mr. Ballinger did not testify at the hearing on the motion for new trial, the defendant failed to present any evidence that might prove Mr. Ballinger performed deficiently and that this prejudiced him. Moreover, the Pharmart manager's trial testimony indicated that she was not authorized to release surveillance tapes to anyone other than a police officer, so even if Mr. Ballinger had tried to obtain the surveillance tapes, he would have been unable to do so personally. The defendant has not proven ineffective assistance.

## III.

The defendant argues that the trial court erred by failing to give curative instructions to the following remarks Thompson made during her testimony: "You know you did it, boy."; "[H]e [the defendant] was a Crack head."; "Why did you do it?"; and "See, you really need to tell us who the other man was so you won't take the rap by yourself." Because no objection or request for curative instruction was made, this issue is waived. T.R.A.P. 36(a). Even so, any resulting error must be deemed harmless because the defendant has not shown how these particular statements affected the jury's verdict, especially considering that notwithstanding these remarks, the thrust of Thompson's testimony was that the defendant attempted to rob Bevels and murdered Martin. Tenn. R. Crim. P. 52(a).

## IV.

Next, the defendant argues that Detective Roland's failure to diligently procure the Pharmart surveillance tapes constituted prosecutorial misconduct and prejudiced his right to a fair trial. Citing State v. Marvin K. Ferguson, No. 03C01-9406-CR-00235, Washington County (Tenn. Crim. App. filed July 17, 1997, at Knoxville), appeal granted (Tenn. March 23, 1998), the defendant argues that the police must preserve material evidence, including exculpatory evidence, and that Detective Roland's "lack of effort" in obtaining the surveillance tapes "directly resulted in the tapes being erased before their retrieval," which prejudiced his ability to prove his alibi.

In Arizona v. Youngblood, 488 U.S. 55, 58 (1988), the United States Supreme Court held that the prosecution's failure to preserve evidence potentially useful to the defendant may constitute a denial of due process of law, assuming the defendant can prove the police acted in bad faith. In a dissenting opinion, three members of the Court disagreed that a "bad faith" standard was appropriate, instead positing that the focus of the inquiry should be on the materiality of the evidence, its potential to exculpate, and the existence of other evidence on the same point of contention. Id. at 67-70.

In Ferguson, the unpublished opinion relied upon by the defendant here, the special judge writing for the panel rejected the majority holding in Youngblood, instead choosing to rely on the standard preferred by the Youngblood dissent. The two other members of the Ferguson panel, however, each wrote separate concurring opinions, agreeing in the result only, but disagreeing with the special judge on the application of Youngblood.[1] Moreover, in numerous other opinions, two of which are

---

[1]One of the concurring judges wrote that the bad faith standard pronounced by the Youngblood majority should be applied, whereas the other concurring judge wrote that he did not believe that the Ferguson case was the proper case in which to decide whether "due process under the Tennessee Constitution requires bad faith on the part of the state [i.e., the Youngblood standard] in all instances."

15

published, this Court has followed the majority opinion in <u>Youngblood</u>. <u>See, e.g.</u>, <u>State v. Eldridge</u>, 951 S.W.2d 775 (Tenn. Crim. App. 1997); <u>State v. Jefferson</u>, 938 S.W.2d 1 (Tenn. Crim. App. 1996); <u>see also</u> <u>State v. Ricky Hill Krantz</u>, No. 01C01-9406-CR-00207, Davidson County (Tenn. Crim. App. filed January 7, 1998, at Nashville); <u>Robert Lloyd Wiggins v. State</u>, No. 03C01-9605-CC-00191, McMinn County (Tenn. Crim. App. filed March 20, 1997, at Knoxville), <u>app. denied</u> Tenn. 1997); <u>State v. Jerry Douglas Franklin</u>, No. 01C01-9510-CR-00348, Davidson County (Tenn. Crim. App. filed February 28, 1997, at Nashville), <u>app. denied</u> (Tenn. 1997). For these reasons, we question the defendant's reliance on <u>Ferguson</u>.

Under the <u>Youngblood</u> analysis, the defendant's argument must fail because there is no evidence that the police acted in bad faith in failing to secure the surveillance tapes.[2] Even assuming that <u>Ferguson</u> was the proper standard to apply in this case, however, the defendant's argument still fails because nothing in the record establishes that the surveillance tapes were either material or exculpatory. Detective Roland testified the Pharmart manager told him that while the surveillance tapes reflected a time, they did not reflect whether the time was a.m. or p.m., and they did not reflect a date. Moreover, according to the defendant and other defense witnesses, the defendant was in the Pharmart convenience store (and thus on the Pharmart surveillance tapes) between 4:00 and 5:00 p.m., but the shooting in this case occurred between 6:00 and 7:00 p.m., giving the defendant ample time to commit the crimes charged in this case even if he was in fact at the convenience store earlier that afternoon. Thus, contrary to the defendant's assertions, the surveillance tapes were neither material nor exculpatory because obtaining them would have done little if anything to establish an alibi for the shooting.

---

[2]Because the defendant relies upon the special judge's opinion in <u>Ferguson</u>, which omits a "bad faith" requirement, he does not even attempt to show any evidence of bad faith in the record.

16

Further, even assuming that the surveillance tapes were material and exculpatory, nothing in the record establishes that it would have been possible for Detective Roland to obtain the tapes, even if he exercised due diligence. Detective Roland testified that he learned of the tapes' existence on December 18 and that on December 21, he learned the tapes were no longer available because they had already been erased, taped over, or otherwise destroyed. Nothing in the record, however, establishes when the tapes were erased, taped over, or otherwise destroyed. In fact, it is possible that the tapes were erased, taped over, or otherwise destroyed before Detective Roland even learned of their existence.

**V.**

Finally, the defendant argues that the trial court erred in denying his motion for a new trial because "newly discovered evidence," i.e., a statement by Morris Swanson that he had witnessed the murder, requires a new trial. At the hearing on the motion for new trial, Michael Gulley, a case worker at the Mental Health Cooperative, testified that one of his clients, Morris Swanson, lived at the apartment complex where the murder and attempted robbery occurred. According to Gulley, Martin was also a patient at the Mental Health Cooperative, so when the murder was reported to them, Gulley became concerned about Swanson and called him. Gulley testified that Swanson told him he had seen "the whole thing" and had been robbed earlier that evening by the same men who

17

shot Martin. According to Gulley, Swanson told him after the defendant's conviction that "they've got the wrong guy."

Swanson, a schizophrenic on medication, also testified at the hearing on the motion for new trial. Swanson admitted being robbed between 5:00 and 7:00 p.m. on December 13, but he repeatedly denied telling Gulley that "they had the wrong person." Swanson also testified that he did not know the name or the face of the man who shot Martin.

Contrary to the defendant's argument, this evidence does not entitle him to a new trial. In order to receive a new trial on the basis of newly discovered evidence, a defendant must demonstrate that he exercised reasonable diligence in seeking the evidence, that the evidence is material, and that it will likely change the outcome of trial. State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994). Even assuming that the defendant could meet the first two prongs of this test, he has not shown a likelihood of acquittal on retrial. As the trial court recognized, Swanson's testimony is not helpful to the defendant: "[H]is testimony here was very clear and extremely emphatic, that he did not see who did the murder. And I don't know how you're going to get him to say anything different from that." Moreover, Gulley's testimony that Swanson apparently told him he witnessed the murder and that the defendant was not the murderer is not helpful to the defendant because it is sketchy at best. The jury here heard testimony from the defendant and other alibi witnesses that the defendant was not in the area at the time of the shooting and did not commit the crimes with which he was charged, but the jury still chose to believe the testimony of three eyewitnesses, each of whom claimed the defendant was the shooter. There is no reason to believe that the hearsay testimony of a mental health case worker regarding statements his patient made to him would change

18

that, especially when considering that Swanson would deny ever making those statements. Accordingly, the trial court properly denied the motion for new trial on this basis. See Nichols, 877 S.W.2d at 737.

## VI.

The defendant has failed to show reversible error. Accordingly, his convictions and sentence are affirmed.

_____
JOHN H. PEAY, Judge


CONCUR:


_____
JOSEPH M. TIPTON, Judge


_____
NORMA McGEE OGLE, Judge

19